UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **BANK OF LOUISIANA** | **CIVIL ACTION** |
| **VERSUS** | **NO: 07-1228** |
| **SUNGARD RECOVERY SERVICES, INC., NOW KNOWN AS SUNGARD AVAILABILITY SERVICES, LP** | **SECTION: "S" (5)** |

## ORDER AND REASONS

**IT IS HEREBY ORDERED** that the motion for summary judgment of Sungard Recovery Services, Inc., now known as Sungard Availability Services, LP, on Bank of Louisiana's claim and SunGard's counter claim is **GRANTED**.  (Document # 13.)

### I. BACKGROUND

Prior to Hurricane Katrina, Bank of Louisiana operated six branches in the New Orleans area and maintained an in-house "Information Technology" (IT) Center at 3340 Severn Avenue in Metairie, Louisiana.  The focus of this action is the recovery of Bank of Louisiana's IT Center in the aftermath of Hurricane Katrina.

Pursuant to federal and state regulations, Bank of Louisiana is required to maintain contingency coverage for its operations in the event that a catastrophe impairs or disrupts its ability to meet the needs of its customers.  On September 18, 1997, Bank of Louisiana entered a

"Recovery Services Agreement" (the agreement) with SunGard Recovery Services, Inc., now known as SunGard Availability Services, LP (SunGard), to provide recovery services for the duration of a disaster. On August 29, 2005, Hurricane Katrina disabled Bank of Louisiana's banking and IT operations. Peggy Schaefer, the Chief Financial Officer, called SunGard to request services provided by the agreement. According to Schaefer, she spoke with SunGard personnel in Smyrna, Georgia, but was unable to successfully retrieve the necessary data.

Bank of Louisiana filed a complaint against SunGard for breach of contract. Bank of Louisiana seeks damages of $901,992.50, attorney's fees, and costs. SunGard filed a counterclaim for failure to pay the balance of the 60-month term of the agreement, from the date of the hurricane through the end of the contract term. SunGard filed a motion for summary judgment on Bank of Louisiana's breach of contract claim and SunGard's counterclaim.

## II. DISCUSSION

**A.  Legal standard**

Summary judgment is proper when, viewing the evidence in the light most favorable to the non-movant, "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Amburgey v. Corhart Refractories Corp., 936 F.2d 805, 809 (5th Cir. 1991); Fed. R. Civ. P. 56(c). If the moving party meets the initial burden of establishing that there is no genuine issue, the burden shifts to the non-moving party to produce evidence of the existence of a genuine issue for trial. Celotex Corp. v. Catrett, 106 S.Ct. 2548, 2552 (1986). The nonmovant cannot satisfy the summary judgment burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence. Little v. Liquid Air Corp.,

37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  A fact is "material" if its resolution in favor of one party might affect the outcome of the lawsuit.  Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2510 (1986).  An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party.  Id.  If the opposing party bears the burden of proof at trial, the moving party does not have to submit evidentiary documents to properly support its motion, but need only point out the absence of evidence supporting the essential elements of the opposing party's case.  Saunders v. Michelin Tire Corp., 942 F.2d 299, 301 (5th Cir. 1991).

**B. Breach of contract**

SunGard contends that Bank of Louisiana has not established that SunGard breached a duty that it owed to Bank of Louisiana under the agreement.  SunGard contends that it was available to comply with its obligations under the agreement by reserving a compatible system and technicians for Bank of Louisiana's use from the moment it received the disaster alert on September 4, 2005, until Schaefer canceled the disaster alert on September 14, 2005.  SunGard argues that it was Bank of Louisiana's responsibility to provide backup tapes and send them to SunGard's facility in Georgia where the compatible system was waiting.  SunGard communicated with Schaefer over a four-day period, assisting her in her attempt to locate Bank of Louisiana's back-up data tapes.  SunGard argues that Schaefer was unable to locate the tapes; get any assistance from Bank of Louisiana's information technology employees; run subsequent back-up tapes because of lack of power; or contact George Harrison Scott, Bank of Louisiana's chairman, president, and majority stockholder.  SunGard contends that, on September 8, 2005, when Schaefer was able to remove the hard drives from her AS/400 computer, she made the

3

decision to ship the hard drives to Michigan for recovery, and recover her data with Metavante/Kirchman, rather than to follow through under the agreement with Sungard.

Section D, ¶ 10 of the agreement provides that Pennsylvania law governs the agreement. To establish a contract under Pennsylvania law, three elements must be alleged: (1) the parties reached a mutual understanding; (2) they exchanged consideration; and (3) they determined the terms of the agreement with sufficient clarity. See Weavertown Transport Leasing Inc. v. Moran, 834 A.2d 1169, 1172 (Pa. Super. Ct. 2003). "To support a claim for breach of contract, a plaintiff must allege: (1) the existence of a contract between the plaintiff and defendant including its essential terms; (2) a breach of duty imposed by the contract; and (3) damages resulting from that breach of duty." Boyd v. Rockwood Area School Dist., 907 A.2d 1157, 1165 (Pa. Cmmw. Ct. 2006) (citing CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053 (Pa. Super. Ct. 1999)). "The primary objective of a court when interpreting a contract is to ascertain the intent of the parties." Widmer Engineering, Inc. v. Dufalla, 837 A.2d at 471. "When a written contract is clear and unequivocal, its meaning must be determined by its content alone." Id.

The parties are in agreement that there is a contract between them. The gravamen of Bank of Louisiana's complaint is that SunGard was not proactive in providing support. Bank of Louisiana alleges that SunGard breached the agreement, specifically sections A ¶2(a)(i)(c) & (d) and A¶3, by failing to send equipment and personnel to the New Orleans area. Bank of Louisiana argues that SunGard did not offer Schaefer an alternative to sending the tapes or the "machine" to Georgia.

Section A of the agreement provides in relevant part:

**2. SELECTED SERVICES**.  Whenever Subscriber declares a Disaster, the Recovery Services to be provided by SunGard to Subscriber shall be the following services which were selected by Subscriber in the applicable Schedule:

**(a) Mobile Recovery Services**.  Immediate and exclusive use of the services described below ("Mobile Recovery Services"), which Subscriber may use for the duration of a Disaster:

**(i) Replacement Recovery System**.  A fully operational, relocatable computer system and networking capability ("Replacement Recovery System"), equal to or better than (in all material respects including equipment quality and processing capacity) the Mobile Configuration described in the Schedule, to be provided to Subscriber by one of the following methods at Subscriber's option;

**a.    Primary Recovery Facility**.  Access to the Replacement Recovery System at a SunGard facility where it is then installed.
**b.    Alternate Recovery Facility**.  Delivery of the Replacement Recovery System to a SunGard facility where it may be accommodated, within 48 hours after SunGard receives the Disaster declaration notice.
**c.    Mobile Data Center**.  Delivery of a properly equipped vehicle housing the Replacement Recovery System to a destination in the continental United States requested by Subscriber, within 48 hours after SunGard receives the Disaster declaration notice.
**d.  Subscriber Facility**.  Delivery of the Replacement Recovery System to a properly equipped facility located in the continental United States requested by Subscriber, within 48 hours after SunGard receives the Disaster declaration notice.

**. . . .**

**3.  RECOVERY SUPPORT.**  Whenever Subscriber uses Recovery Services during a Disaster, SunGard's Support Staff (consisting of operations, communications, security, transportation, systems software and customer support personnel, as appropriate) shall provide reasonable support to Subscriber on an as needed basis.  During a Disaster, SunGard's Support Staff also shall assist Subscriber in contacting vendors and in obtaining and installing additional or replacement equipment.

In support of the motion for summary judgment, SunGard provides the following deposition testimony of Schaefer concerning Bank of Louisiana's disaster plan and the events

that occurred in the aftermath of Hurricane Katrina.  Schaefer testified that the Federal Deposit Insurance Corporation (FDIC) and the Louisiana Office of Financial Institutions (OFI) require the bank to have a disaster recovery plan in place.  As Chief Financial Officer, Schaefer was responsible for disaster planning for the bank, but her responsibility prior to Hurricane Katrina did not include information technology.  Scott had overall responsibility for disaster planning and coordination,[1] and a former employee, Jimmy McAlpin, hired a professional team to assist in writing the first disaster recovery plan.  During an audit in June or July 2005, the regulatory agencies did not find any deficiencies with the bank's recovery plan.

John Mulè,[2] the vice-president of the information technology department, maintained a copy of the recovery plan.  Providing backup computer tapes was a critical part of the bank's recovery policies and procedures.  Each year, Efrain Martinez,[3] the operations manager, would conduct a drill with SunGard by flying to Georgia with the back-up tapes.  Each year, the test was successful, and SunGard was able to recover the data.  Schaefer testified that, under the recovery plan, the "IT person" was designated to coordinate with SunGard.  It was her understanding that, if a disaster struck, someone in IT would "grab backup tapes and jump on a

---

[1]   Because of an unfortunate accident involving a faulty generator, Scott was unavailable.  Schaefer was not able to contact Scott until September 11th or 12th, 2005.

[2]   Mulè was absent from work on Thursday and Friday prior to the hurricane because his mother was ill and not expected to live.  Mulè did not return to his position after Hurricane Katrina.  He was terminated on September 23, 2005, because Bank of Louisiana outsourced its information technology department to Kirchman.

[3]   Martinez stayed at the bank during the storm.  He informed Schaefer that he was going  home when the water receded, but Schaefer was not able to reach him until September 15th when he returned to the bank.

plane to go to Georgia."

The first person Schaefer reached at SunGard was Dan Lux, who gave her the appropriate contact numbers to declare a disaster. Schaefer declared an emergency to Lucy Ortiz and Robert Cabrera with SunGard on September 4, 2005. Preston Studstill provided Schaefer with the shipping address to send the backup tapes to Smyrna, Georgia. Schaefer's understanding of the agreement was that SunGard would provide Bank of Louisiana with the computer equipment listed on Schedule A of the agreement in its center in Smyrna, Georgia. Studstill verified that SunGard had reserved and kept available a business computer system, that was compatible with Bank of Louisiana's in-house IBM AS/400, and other peripheral equipment.

Schaefer tried to communicate with key employees of Bank of Louisiana by cell phone, e-mail, and other telephone numbers, but nothing worked because everyone had evacuated. Schaefer testified that she eventually reached Rodney Granger by e-mail, and he gave her the combination to the small vault where the back-up tapes should have been stored.

On September 5, 2005, Schaefer went to the Severn branch for the first time with Tim Roper, Marion Comiskey Roper, and two state troopers. She opened the vault, but the tapes that were in the vault did not contain the data that was backed up prior to Hurricane Katrina.[4] Lucy Ortiz and Preston Studstill talked to Tim Roper in an attempt to help him find the back-up tapes.

Unable to find the tapes, Schaefer enlisted the assistance of Cherbonnier, Mayer & Associates (CMA), technicians recommended by the FDIC, to accompany her to the Severn

---

[4] According to Schaefer, the night operator ran the tapes, and Martinez stated that he personally saw the backup tapes. Schaefer has not been able to ascertain what happened to the tapes.

branch. On September 6, 2005, Schaefer told Lucy Ortiz that CMA and Roper were going to run the AS/400 on a generator, backup the data, and ship the tapes to Georgia. Unfortunately, the generator did not provide enough power, and Schaefer was unable to produce back-up tapes. She never requested the delivery of a mobile data center or the delivery of a replacement recovery system.

In a further attempt to resolve the situation, on September 7, 2005, Schaefer consulted with Charles Thompson, a Kirchman account representative, and hired Lance Thompson to recover the data. The decision was made to remove the hard drives and ship them to Diverse Computer Marketers of Lansing, Michigan. Schaefer did not consider shipping the hard drives to SunGard. Schaefer call Lucy Ortiz and told her that she had made a decision to recover the data with Kirchman. Schaefer ended the disaster declaration with SunGard on September 14, 2005, during a conversation with Bob DiLossi.

On September 20, 2005, Schaefer entered a three-year contract to outsource core processing. Schaefer testified that she had no alternative because she could not "meet the demands that SunGard wanted [her] to meet" and she did not have "any bank employees to do the work." The plans to outsource had begun long before Katrina because the bank needed to update the core bank processing and outsourcing was expected to be less expensive. Therefore, she had an entrée into the Kirchman program, and simply continued the process after the disaster.

Robert DiLossi, the manager of SunGard's crisis management operations at the time of the hurricane, outlined in an affidavit the procedures SunGard follows after a disaster is declared.

The crisis management team first contacts the customer to verify the nature of the problem and to identify the equipment needed for recovery.  The crisis management team then contacts the resource management team to allocated the needed resources, including facility space and equipment.  The crisis management team reviews the information with the customer and attempts to determine an arrival time for the customer's information technology staff and backup tape shipments.  Prior to arrival, the operations team configures and makes ready the equipment.  The technical staff provides support during the recovery, but does not replace the customer's IT staff or travel to the customer's location to perform tape backup services.  Annually, SunGard conducts testing exercises in SunGard's Recovery Centers.  SunGard provides customers with information workbooks and reference sheets to assist in gathering information needed at the time of a disaster in an effort to accelerate the recovery process when a customer's primary recovery team is unavailable.

     DiLossi states that Bank of Louisiana was well versed in the procedures to be followed. Prior to Hurricane Katrina, Martinez opened an "alert" status on July 8, 2005, in connection with the approach of Hurricane Dennis.  SunGard found a deficiency in the procedure and advised Martinez that Bank of Louisiana's "Disaster Declaration Authorization" form was not up to date and needed to be corrected.  On July 12, 2005, SunGard was advised that the "alert" could be closed.

     Prior to August 23, 2005, SunGard was monitoring the path of Hurricane Katrina and making calls to customers that could potentially be affected.  SunGard accepted approximately 127 disaster "alerts" and 32 disaster declarations from its customers.  Twenty-eight of the

disaster declarations were from SunGard customers in the vicinity of New Orleans. Most customers submitted declarations on or before August 31, 2008, but Bank of Louisiana, through Schaefer, did not contact SunGard until September 4, 2005.

In response to Schaefer's call, SunGard reserved equipment at the Smyrna, Georgia, Recovery Center and reviewed information with Schaefer. Schaefer informed that she had no technical background, and the IT staff, the disaster recovery coordinator, and the backup tapes could not be located. SunGard arranged for technical staff to assist Schaefer in recovering the data processing operations because IT employees were not responding to her calls. Schaefer asked if she could ship the A/S 400 to a SunGard facility, and SunGard recommended that Schaefer try to backup the tapes before they would consider the unusual step of shipping the A/S 400. According to DiLossi, and Schaefer does not dispute, Schaefer did not request that SunGard ship equipment and staff to her in Louisiana. DiLossi states that, even if such a request had been made, the conditions following Hurricane Katrina would have made shipping equipment and obtaining the proper power "hook ups" for accepting mobile data centers unlikely.

On September 6, 2005, Schaefer informed SunGard that she was attempting to have a consultant run backup tapes and that she would stay in contact with SunGard. On September 8, 2005, Schaefer reported to SunGard that she restored her A/S 400 by removing the hard drive and retrieving the bank's data at Kirchman. Schaefer was working with Kirchman and would let SunGard know if she would need the equipment that SunGard reserved in Georgia. Schaefer had questions concerning assistance with the bank's check sorting. DiLossi explained that check

sorting could not be conducted remotely and that he needed tapes, the hard drive, or the A/S 400.

DiLossi tried unsuccessfully to reach Schaefer through September 13, 2005.  He had no other contact numbers because the bank's "Disaster Declaration Authorization" form was still incomplete despite the July 2005 recommendation.  On September 14, 2005, Schaefer informed DiLossi that the bank decided to send the hard drive to Kirchman because she was under pressure by the Federal Reserve to restore the bank's operations.  Schaefer instructed SunGard to close the bank's disaster declaration.

Bank of Louisiana presents the deposition of Scott to support the claim that SunGard breached the agreement.  Scott acknowledges that the Bank of Louisiana had a disaster plan, but it was his opinion that, under the contract, SunGard had to "handle everything" in the event of a hurricane.  He expected that SunGard would be proactive and set up everything before the storm approached.  Although Scott was not in contact with SunGard in the aftermath of the hurricane, he faults SunGard for not electing the option of sending a "truck" to the New Orleans area.  Scott viewed the disaster plan that included going to Georgia with the tapes as a "mistake" because, in formulating a plan, the drafters of the plan probably did not envision this type of chaos.

After carefully considering the documentary evidence, deposition testimony, and affidavits, the court concludes, as a matter of law, that SunGard did not breach its contract with the Bank of Louisiana.  As required by federal and state law, the Bank of Louisiana developed a disaster recovery plan and tested the plan in an annual drill by sending a manager and the backup tapes to the SunGard facility in Georgia to recover the data.  The evidence establishes that this was the understanding of Schaefer and SunGard of how the disaster recovery plan would be

conducted in the event of a real disaster. Scott essentially affirms that he understood that this was the plan, although he now disagrees with it and refers to it as a "mistake."

The breakdown in the execution of the plan was the absence of Board of Louisiana IT personnel to begin the initial phase of the plan, *i.e.* locating or reproducing the backup tapes. Schaefer made a valiant effort to protect the bank and its customers by communicating with SunGard, trying to contact the bank's IT personnel, gaining access to the IT center, locating the combination of the small vault where the backup tapes should have been stored, and enlisting the assistance of local technicians to extract the hard drives. Schaefer did not request a deviation in the rehearsed plan. She did not ask SunGard to send personnel or a mobile data center to New Orleans or to deliver the recovery system to a Bank of Louisiana facility. It is well-documented that access to the New Orleans area was difficult, and electric power was not reliable. Specifically, Schaefer states that she gained access to the center accompanied by state troopers, and that the IT center did not have power.

SunGard personnel stayed in contact with Schaefer from September 4, 2005, to September 8, 2005, when she decided to remove the hard drives and send them to Michigan. SunGard made recovery support technicians available to Schaefer by telephone because she explained that she lacked the necessary knowledge to extract the data that SunGard required.

SunGard also complied with the contract by identifying the space and equipment needed for recovery and then making it available at the Georgia facility. In order to use SunGard's services, Bank of Louisiana IT staff had to be present at the bank's operations center and at SunGard's facility, just as they had been when they tested and drilled the recovery plan on

previous occasions.  There is no evidence that Schaefer requested any other method of recovery.

Notwithstanding, through hard work and ingenuity, Schaefer was able to enlist assistance to remove the hard drives.  There is no evidence that Schaefer consulted with SunGard to notify them she had removed the hard drive or to inquire whether she should send them to Georgia, instead of Michigan, or send the tapes to Georgia after the data was retrieved.  Schaefer instead ceased all contact with SunGard until she canceled the disaster declaration on September 14, 2005.  Meanwhile, after retrieving the hard drives, she forwarded them to Michigan.  On September 15, 2005, one week after Schaefer sent the hard drives to Michigan, Martinez returned to work and was available to assist in the recovery.

Under the most difficult of circumstances, Schaefer made the decision to contract with another company to retrieve the data, outsource the core processing, and resume banking operations.  This decision was facilitated because the Bank of Louisiana had previously initiated plans pre-Katrina to outsource the core processing.

The court concludes that SunGard has met the initial burden of establishing that there is no genuine issue, and Bank of Louisiana has not carried its burden to produce evidence of a breach of a duty imposed by the contract.  Accordingly, there are no disputed issues of material fact, and SunGard is entitled to judgment as a matter of law on the breach of contract claim.

## C.  Counterclaim for unpaid invoices

On November 5, 2005, Schaefer wrote to SunGard expressing Bank of Louisiana's view that the contract was void and that SunGard's services were not needed.  Opposition, exh. A. Bank of Louisiana alleges that it has a right to cancel the contract for cause because it did not

receive any assistance during the disaster and that it was forced to outsource the core processing.

SunGard contends that there is no cause for the termination of the agreement, and Bank of Louisiana owes for unpaid invoices under the agreement, which was executed on June 15, 2003, and provides for a sixty month term. SunGard argues that Bank of Louisiana has not paid an invoice since August 2005 and is responsibility for payments through the end of the contract term.[5]  SunGard relies on the affidavit of Scott T. Crouch, a vice-president of Financial Operations, to support its claim for unpaid service fees. Under the contract, the monthly fee as of August 2005 was $2,349; in June 2006, the fee increased to $2,467; and in April 2008, the fee increased to $2,590.  Bank of Louisiana made no payments for invoices from August 2005 through the end of the term of the contract.

"When performance of a duty under a contract is due, any nonperformance is a breach." Widmer Engineering, Inc. v. Dufalla, 837 A.2d 459, 467 (Pa. Super. 2003) (citation omitted). "If a breach constitutes a material failure of performance, then the non-breaching party is discharged from all liability under the contract." Id.  "If, however, the breach is an immaterial failure of performance, the contract was substantially performed, the contract remains effective." Id.  "In other words, the non-breaching party does not have a right to suspend performance [if the breach is not material]. Id.

Section D, ¶ 6 of the agreement provides the grounds for termination as follows:

**TERMINATION FOR CAUSE**.  If either party breaches any of its obligations under this Agreement in any material respect and the breach is not substantially

---

[5] SunGard reserves its claim for costs and attorney's fees under Section D ¶ 10 of the agreement.

cured within the cure period specified below, then the other party may terminate this Agreement or any Schedule(s), without penalty, by giving written notice to the breaching party at any time before the breach is substantially cured. With respect to a breach of SunGard's obligation to provide the Recovery Services to Subscriber during a Disaster, the cure period shall be five days. With respect to Subscriber's payment obligations, the cure period shall be ten days after receipt of SunGard's written notice of non-payment.

As discussed above, Bank of Louisiana has not established that SunGard has breached its obligations under the agreement in a material respect. Accordingly, it has not shown that there was cause to terminate the contract. Accordingly, there are no disputed issues of material fact, and SunGard is entitled to judgment as a matter of law on the counterclaim for failure to pay for the balance of the 60-month term of the agreement.

New Orleans, Louisiana, this __17th__ day of March, 2008.

_____
**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**